Ramsey ALEXANDER and Robert F. Newman et al., Plaintiffs-Appellees,

Raymond L. Dennis and Warner McCreary, Plaintiffs-Intervenors,

v.

AERO LODGE NO. 735, INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, AFL-CIO, Defendant-Appellant.

Ramsey ALEXANDER and Robert F. Newman et al., Plaintiffs-Appellees,

Raymond L. Dennis and Warner McCreary, Plaintiffs-Intervenors,

v.

AVCO CORP., AEROSPACE STRUCTURES DIVISION, Defendant-Appellant.

Nos. 75-1776 and 75-2097 to 75-2099.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 13, 1976.

Decided Nov. 1, 1977.

Rehearing and Rehearing En Banc Denied Jan. 24, 1978.

Cecil D. Branstetter, Carrol D. Kilgore, Branstetter, Moody & Kilgore, Nashville, Tenn., for defendant-appellant in 75–1776 and 75–2098.

William Waller, Sr., Robert McCullough, Nashville, Tenn., for defendant-appellant in 75–1776.

Naphin, Banta & Cox, Don A. Banta, Chicago, Ill., for defendant-appellant in 75–1776, 75–2097 and 75–2099.

Avon N. Williams, Jr., Nashville, Tenn., Jack Greenberg, New York City, Morris J. Baller, Mexican American Legal Defense Fund, San Francisco, Cal., Lutz A. Prager, E.E.O.C., Washington, D.C., for plaintiffs-appellees in 75–1776, 75–2097, 75–2098 and 75–2099.

James P. Scanlan, E.E.O.C., Washington, D.C., for amicus curiae E.E.O.C. and plaintiffs-appellees in 75–2097, 75–2098 and 75–2099.

William Waller, Waller, Lansden, Dortch & Davis, Nashville, Tenn., for defendant-appellant in 75–2097 and 75–2099.

James M. Nabritt, III, New York City, Russell C. B. Ennix, Jr., Nashville, Tenn., for plaintiffs-appellees in 75–2097 to .75–2099.

Before EDWARDS and ENGEL, Circuit Judges and CECIL, Senior Circuit Judge.

ENGEL, Circuit Judge.

These appeals involve two employment discrimination actions brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and Section 1 of the Civil Rights Act of 1866, 42 U.S.C. § 1981. The suits were consolidated for trial and present common issues concerning individual and class wide allegations of racial discrimination.

Plaintiff Ramsey Alexander, a black male, commenced a class action on January 13, 1966 against Avco Corporation's Aerospace Structures Division in Nashville, Tennessee (Avco or the Company) and against the union, Aero Lodge No. 735 of the International Association of Machinists and Aerospace Workers, AFL–CIO (Aero Lodge or the Union), which represents the hourly employees at that facility. Alexander alleged that on account of his race Avco had denied him certain promotional opportunities and that Aero Lodge had failed to represent him fairly. He sought to represent a class of black employees and job applicants, complaining that Avco had engaged in discriminatory practices as to them in the areas of training, transfers, promotional opportunities, and job classifications and that Aero Lodge had cooperated with the Company in these practices.[1]

In 1971 the district court allowed two black males, Raymond L. Dennis and Warner McCreary, to intervene in this action, based on their allegations that Avco was racially motivated in discharging Dennis and in suspending McCreary and that Aero Lodge did not fairly present their grievances.

Plaintiff Robert F. Newman, a black male, filed a separate class action on December 30, 1968, alleging that Avco had unlawfully discharged him on the basis of his race and that Aero Lodge failed to process his grievance adequately. He raised allegations of discriminatory class wide practices similar to those contained in the Alexander complaint. Both plaintiffs sought injunctive and other equitable relief, as well as monetary awards for their lost

---

1. More precisely, Alexander sought to represent blacks "who are likewise employed by the defendant, Avco Corporation, and are members of the defendant, Aero Lodge No. 735" and black "applicants and/or prospective applicants for employment by the defendant, Avco Corporation and for membership in the defendant, Aero Lodge No. 735 who are denied such employment."

wages. By an amendment filed shortly before trial, they also requested back pay for class members.

On a summary judgment motion the district court dismissed Newman's complaint on the ground that he had made a binding election of remedies by earlier submitting his claim to an arbitrator. Rejecting that conclusion, this court reversed and remanded for a hearing on the merits. *Newman v. Avco Corp.*, 451 F.2d 743 (6th Cir. 1971).

A consolidated trial was held between June 26 and August 5, 1972, and the parties presented evidence concerning the individual and class wide claims. By a memorandum decision of December 18, 1973, the district court sustained the individual claims of plaintiffs Alexander and Newman against both the Company and the Union. It sustained Dennis' claim against the Company, but held that the Union had in fact represented him fairly. The court found no violation of McCreary's rights. Further, the court held that the plaintiffs were proper representatives of a class:

> [C]onsisting of past, present and prospective black employees of the defendant Avco Corporation, and past, present and prospective black members of Aero Lodge No. 735, who allegedly have suffered or may suffer by reason of the alleged discriminatory practices of the defendants. These plaintiffs have standing to properly challenge the alleged racially discriminatory policies and practices of the defendant company, Avco Corporation, in the areas of (a) classification as to the types of employment available to black people, (b) training, (c) working conditions, (d) promotions, (e) transfers, (f) compensation, and (g) terminations. Plaintiffs further have standing to challenge the alleged racially discriminatory policies and practices of defendant union Aero Lodge No. 735 in allegedly unfairly, inadequately, arbitrarily, discriminatorily, and in bad faith representing the interests of black employees in these areas.

Significantly, this class did not include unsuccessful black job applicants, but only black employees at Avco. The court found that both the Company and the Union had engaged in several employment practices that unlawfully discriminated against the class.

Prior to this opinion there had been no formal determination under Rule 23(c)(1), Fed.R.Civ.P., as to whether the suits were properly brought as class actions. Three days before trial, the plaintiffs did file a motion for an evidentiary hearing on this question, but it was not expressly resolved until the decision on the merits 18 months later.

At a subsequent hearing the defendants contended that the failure to give notice of the suit to class members violated due process. The district court agreed and decertified the class on August 20, 1974, while allowing certain black employees to intervene individually. It ordered Avco to reinstate Newman and Dennis to their former positions, to promote Alexander to a better job, and to pay the men lost wages. However, upon reconsideration the court reversed this ruling as to the class and by a February 11, 1975 order reinstated the class action and required that notice be then given to the class members. The individual relief was reaffirmed and the defendants were required to comply immediately with a plan of general injunctive relief. Defendant Avco filed a timely motion to amend a small portion of the injunctive relief, which request was granted in part on July 16, 1975.

Following an additional hearing, the court entered an order on June 3, 1975 fixing the amounts of back pay for the individual plaintiffs and awarding attorney fees. A June 20, 1975 order slightly modified the latter award.

Both defendants noted an appeal from the orders of February 11 and June 3, and Avco also appealed from the June 20 order. The Company and the Union challenge the class action on procedural grounds, dispute the findings of discriminatory practices, and assert that the district court exceeded its

authority as to certain aspects of the injunctive relief and by awarding excessive attorney fees.

We reverse in part the findings of class wide violations, vacate the injunctive relief, and remand for further proceedings. As to the individual claims, we affirm the orders as to Robert F. Newman and Raymond L. Dennis, but reverse as to Ramsey Alexander.

## I. JURISDICTIONAL ISSUES

■ While not specifically raised by the parties, we consider the threshold question of jurisdiction of the appeal herein, because it is apparent that the orders appealed from are not final. Though the plaintiffs expressly requested an award of back pay for class members, the district court has not disposed of this particular prayer for relief.[2] Jurisdiction properly lies, however, under 28 U.S.C. § 1292(a)(1), because the defendants have appealed from an interlocutory order granting injunctive relief.[3] *Liberty Mutual Insurance Co. v. Wetzel*, 424 U.S. 737, 744, 96 S.Ct. 1202, 47 L.Ed.2d 435 (1976).

■ We recognize that a court of appeals should ordinarily limit its review to the narrow question of whether the district court abused its discretion in issuing the interlocutory injunction, intruding into the merits of the case only to the extent necessary to decide that issue. *See Blaylock v. Cheker Oil Co.*, 547 F.2d 962, 964–65 (6th Cir. 1976); *Mercury Motor Express, Inc. v. Brinke*, 475 F.2d 1086, 1091 (5th Cir. 1973); *Hurwitz v. Directors Guild of America, Inc.*, 364 F.2d 67, 70 (2d Cir.), *cert. denied*, 385 U.S. 971, 87 S.Ct. 508, 17 L.Ed.2d 435 (1966). The rule, however, is "one of orderly judi-

cial administration and not a limit on jurisdictional power." *Mercury Motor Express, Inc. v. Brinke, supra*, 475 F.2d at 1091. Such self-restraints, which are normally highly desirable in interlocutory appeals, are less attractive where, as here, the case is one of long standing, has already been tried on the merits, and where most of the issues are clearly defined. It is generally recognized that a court possesses the jurisdictional power on the appeal of an interlocutory order containing injunctive relief to reach and decide other aspects of the order which would not be independently reviewable by interlocutory appeal. *Deckert v. Independence Shares Corp.*, 311 U.S. 282, 287, 61 S.Ct. 229, 85 L.Ed. 189 (1940); *Myers v. Gilman Paper Co.*, 544 F.2d 837, 847 (5th Cir. 1977), *resolved on other grounds*, 550 F.2d 41 (5th Cir. 1977). We agree that:

> Once a timely appeal is taken from an order made appealable by statute, the power of a court of appeals should be plenary to the extent that it chooses to exercise it. A court should not close its eyes to what is plainly there.

9 Moore's Federal Practice ¶ 110.25[1] at 273 (2d ed. 1975). *See, e.g., Myers v. Gilman Paper Co., supra*, 544 F.2d at 847; *E. P. Hinkel & Co. v. Manhattan Co.*, 165 U.S. App.D.C. 140, 143, 506 F.2d 201, 204 (1974); *Hedburg v. State Farm Mutual Automobile Insurance Co.*, 350 F.2d 924, 933 (8th Cir. 1965). Therefore, in the posture of this case, we will fully review the district court's rulings on the merits.

■ The defendants' appeals from the court's injunctive order of February 11, 1975 were technically premature because of the pendency of an outstanding motion to modify that order, which was not acted upon until July 16, 1975. Rule 4(a), Fed.R.

---

2. From language appearing in several orders and opinions, it is apparent that the district court contemplated an award of back pay to qualifying members of the class. Also the parties indicated that litigation over back pay was proceeding in the district court. However, we are unable to find any order expressly granting a class wide back pay award.

3. Most of the injunctive relief was to remain in effect for only one year and that period has now expired. However, we are unable to hold that the issues raised are moot for this reason, because of the potential continuing impact upon the relationships of the parties.

App.P.[4] While the time for filing a notice of appeal properly commenced from this latter date, the omission is not jurisdictional. *United States v. Dean*, 519 F.2d 624 (6th Cir. 1975); *Keohane v. Swarco, Inc.*, 320 F.2d 429 (6th Cir. 1963). We decline to prejudice the appeal on this account, especially where the intent of the parties was clear and the appellees have in no way been misled. Given the choice, the court should prefer an excess of diligence to the absence of it.

## II. PROCEDURAL ISSUES

The defendants contend that for several reasons these cases were improperly maintained as class actions and that relief to the class members should be denied.

### A. Delayed request for class monetary relief.

■ Defendants urge that they were prejudiced by the failure of plaintiffs to request monetary relief for themselves and for the class members until shortly before trial, thereby depriving them of an opportunity to prepare an adequate defense to "unknown monetary claims." Apparently this issue has never been raised in the district court. There is no legal bar to raising back pay claims after the filing of a complaint for injunctive relief, or even after a trial on the merits of the discrimination claim, absent an actual showing of substantial preju-

dice. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 424, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). Because the defendants have failed to show specific evidence of prejudice and because there has yet been no class award of back pay, we think this question should be addressed in the first instance by the district court.

### B. Failure to certify a class until the decision on the merits.

[6] Defendants claim that they were prejudiced by the trial judge's failure to certify the class until after trial on the merits, which violated the provisions of Rule 23(c)(1), Fed.R.Civ.P.[5] Our circuit has held that the provisions of Rule 23(c)(1) are mandatory and that the district court is required to enter an order of determination whether requested by the parties or not. *Senter v. General Motors Corp.*, 532 F.2d 511, 520 (6th Cir. 1976); *Garrett v. City of Hamtramck*, 503 F.2d 1236, 1243 (6th Cir. 1974). While the language of the rule is directed to the district court, *Senter v. General Motors Corp., supra*, 532 F.2d at 521, we note that the Supreme Court has concluded that the named plaintiffs' failure to move for class certification prior to trial bears strongly on the adequacy of representation provided to the class members. *East Texas Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 404, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977). Here the plaintiffs did

---

4. Rule 4(a) provides in part:

> The running of the time for filing a notice of appeal is terminated as to all parties by a timely motion filed in the district court by any party pursuant to the Federal Rules of Civil Procedure hereafter enumerated in this sentence, and the full time for appeal fixed by this subdivision commences to run and is to be computed from the entry of any of the following orders made upon a timely motion under such rules: (1) granting or denying a motion for judgment under Rule 50(b); (2) granting or denying a motion under Rule 52(b) to amend or make additional findings of fact, whether or not an alteration of the judgment would be required if the motion is granted; (3) granting or denying a motion under Rule 59 to alter or amend the judg-

ment; (4) denying a motion for a new trial under Rule 59.

On February 19 Avco filed a timely motion to modify the February 11 order. Aero Lodge filed a notice of appeal from this order on March 10, while Avco noted its appeal on June 13. Neither defendant filed a notice of appeal following the entry of the order granting the motion in part.

5. Rule 23(c)(1) states:

> (1) As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained. An order under this subdivision may be conditional, and may be altered or amended before the decision on the merits.

not press the issue until three days before trial began on June 26, 1972.

■ Notwithstanding our strongly expressed views on the desirability of an early determination of whether a class action will be maintained, our circuit has required a showing of actual prejudice to the protesting party, *Senter v. General Motors Corp., supra*, 532 F.2d at 521–22, which we are unable to discover here. The action itself was unquestionably filed as a class action and proceeded to trial on that basis. In both complaints allegations were made of class wide discrimination and the requested remedy was to benefit the class of which plaintiffs were members. The defendants recognized this feature of the suit by responding in their answers to the complaint with the affirmative defense that plaintiffs were not proper class representatives. On a motion to dismiss the Alexander complaint, the district court entered an order denying the motion and indicated that "the action is a proper class action." In Newman's appeal to this court, we noted that he was "an appropriate representative of the class described in the complaint." *Newman v. Avco Corp., supra*, 451 F.2d at 749. Finally, the pretrial orders clearly stated that the named plaintiffs would seek to prove class discrimination and the trial itself proceeded on that basis. These considerations, together with the particular nature of the suit at hand, convince us that it would be a miscarriage of justice to deny class relief on this basis if it is otherwise justified.

## C. Improper certification under Rule 23(b)(2).

Defendants claim that the district court erred in certifying the class under Rule 23(b)(2) because that subdivision contemplates only injunctive or declaratory relief and here monetary relief was also requested.[6] This claim is without merit.

■ Title VII actions alleging class wide discrimination are particularly well-suited to 23(b)(2) treatment since "the common claim is susceptible to a single proof and subject to a single injunctive remedy." *Senter v. General Motors Corp., supra*, 532 F.2d at 525. A request for back pay does not preclude certification under that subdivision. *Senter v. General Motors Corp., supra*, 532 F.2d at 525; *see Franks v. Bowman Transportation Co.*, 424 U.S. 747, 751, 755, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976); *Head v. Timken Roller Bearing Co.*, 486 F.2d 870, 876 n. 9 (6th Cir. 1973).

■ Likewise, defendants' claim that the class of black employees lacks the homogeneity contemplated under Rule 23(b)(2) is without merit. As we stated in *Senter v. General Motors Corp., supra*, "Race discrimination is peculiarly class discrimination." 532 F.2d at 524. The class here is homogeneous, as the discrimination in employment is claimed in all instances to be on the basis of one common characteristic, the race of the employee. Thus it is proper to certify a class under Rule 23(b)(2) even though "the discrimination may have been manifested in a variety of practices affecting different members of the class in different ways and at different times." *Gibson v. Local 40, Supercargoes & Checkers,* 543 F.2d 1259, 1264 (9th Cir. 1976).[7] Avco will have an opportunity later to prove that individual members of the class were not subjected to discriminatory employment practices. *See International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 361–362, 97

---

6. Rule 23(b)(2) provides:

 **(b) Class Actions Maintainable.** An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

 . . . . .

 (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole . . ..

7. Defendants do not claim that the judicial complaints filed by Alexander and Newman contained allegations that were beyond the "scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination." *Tipler v. E. I. duPont de Nemours & Co.*, 443 F.2d 125, 131 (6th Cir. 1971). *See McBride v. Delta Air Lines*, 551 F.2d 113 (6th Cir.), *vacated and remanded*, —— U.S. ——, 98 S.Ct. 411, 54 L.Ed.2d 287 (1977).

S.Ct. 1843, 52 L.Ed.2d 396 (1977); *Franks v. Bowman Transportation Co., supra,* 424 U.S. at 773 n. 32, 96 S.Ct. 1251.

Along the same line, Avco argues in a supplemental brief that class certification was improper in light of the recent decision in *East Texas Motor Freight System, Inc. v. Rodriguez,* 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977), because the named plaintiffs do not "possess the same interests and suffer the same injuries" as the class members.

In *Rodriguez* the plaintiffs attacked a "no-transfer" rule and a seniority system on the ground that they perpetuated past discrimination and locked minorities into less desirable jobs in one unit of the business. Since the named plaintiffs had stipulated that they had not been discriminated against as to their initial hiring and since the district court found that they lacked the qualifications to be hired into the better jobs, the Supreme Court held that they were not proper representatives of the class of persons who had allegedly suffered injuries.

■ On the other hand, the named plaintiffs here complained of specific acts of discrimination that were typical of the category of practices raised on behalf of the class, and the district court ruled after a trial that the plaintiffs had in fact suffered by reason of certain of these practices. Thus, we think that the named plaintiffs suffered the same sort of injuries and possessed a sufficient similarity of interests to make them proper class representatives.

### D. Lack of notice to absent class members prior to the decision on the merits.

Even if properly brought as a Rule 23(b)(2) action, defendants urge that the imposition of class wide liability was improper, because absent class members were not given actual notice of the suit prior to the decision on the merits, thereby, in their view, violating both Rule 23 and the constitutional requirements of due process. Individual notice was not required until the district court's order of February 11, 1975, about a year and a half after the decision on the merits.

■ Nothing in Rule 23 explicitly requires prejudgment notice to absent members of a class by virtue of a certification under Rule 23(b)(2). The mandatory notice provision of Rule 23(c)(2) is expressly confined by its terms to actions under (b)(3),[8] and a number of courts have indicated that actual prejudgment notice is not required by Rule 23 in actions certified under sections other than (b)(3). *See, e. g., Bolton v. Murray Envelope Corp.,* 553 F.2d 881, 883 (5th Cir. 1977); *Ryan v. Shea,* 525 F.2d 268, 275 (10th Cir. 1975); *Wetzel v. Liberty Mutual Insurance Co.,* 508 F.2d 239, 254 (3rd Cir.), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975); *Hammond v. Powell,* 462 F.2d 1053, 1055 (4th Cir. 1972); *Yaffe v. Powers,* 454 F.2d 1362, 1366 (1st Cir. 1972); *Johnson v. Georgia Highway Express, Inc.,* 417 F.2d 1122, 1125 (5th Cir. 1969).

■ Likewise we find unpersuasive defendants' contentions that due process requires prejudgment notice for absent class members in all actions under Rule 23(b)(2). Generally, one is not bound by a judgment unless he was a party or in privity with a party to the action. *Hansberry v. Lee,* 311 U.S. 32, 40, 61 S.Ct. 115, 85 L.Ed. 22 (1940). However, the judgment in a "class" or "rep-

---

8. Rule 23(c)(2) states:

In any class action maintained under subdivision (b)(3), the court shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice shall advise each member that (A) the court will exclude him from the class if he so requests by a specified date; (B) the judgment, whether favorable or not, will include all members who do not request exclusion; and (C) any member who does not request exclusion may, if he desires, enter an appearance through his counsel.

resentative" suit has been treated as an exception, and to an extent "not precisely defined by judicial opinion," it may bind members of the class who were not made parties to the litigation. 311 U.S. at 41, 61 S.Ct. at 118. Due process is satisfied if the procedure "fairly insures the protection of the interests of absent parties." 311 U.S. at 42, 61 S.Ct. at 118. Thus, the issue is whether prejudgment notice is in all cases required for (b)(2) actions in order to protect adequately the absent class members.

The Advisory Committee's Note to Rule 23 concluded that notice was not required in all cases of (b)(1) and (b)(2) actions though it provided for discretionary notice under 23(d)(2):

> Subdivision (d)(2) does not require notice at any stage, but rather calls attention to its availability and invokes the court's discretion. In the degree that there is cohesiveness or unity in the class and the representation is effective, the need for notice to the class will tend toward a minimum. . . . [M]andatory notice pursuant to subdivision (c)(2), together with any discretionary notice which the court may find it advisable to give under subdivision (d)(2), is designed to fulfill requirements of due process to which the class action procedure is of course subject.

39 F.R.D. 69, 106–07.

We agree with the Advisory Committee that prejudgment notice of a (b)(2) class suit need not in all cases be sent to absent class members to comply with the requirements of due process. *See* Comment, "The Importance of Being Adequate: Due Process Requirements in Class Actions under Federal Rule 23," 123 *U.Pa.L.Rev.* 1217, 1233–41 (1975); Note, "Collateral Attack on the Binding Effect of Class Action Judgments," 87 *Harv.L.Rev.* 589, 605 (1974); 7A C. Wright & A. Miller, Federal Practice and Procedure: Civil § 1786 at 143–44 (1972).

This position is supported by recent views expressed in other circuits. *Souza v.*

*Scalone,* 563 F.2d 385 (9th Cir. 1977); *Larionoff v. United States,* 175 U.S.App.D.C. 32, 51, 533 F.2d 1167, 1186 (1976), *aff'd,* 431 U.S. 864, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977); *United States v. Allegheny-Ludlum Industries, Inc.,* 517 F.2d 826, 878–79 (5th Cir. 1975), *cert. denied,* 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976); *Frost v. Weinberger,* 515 F.2d 57, 65 (2d Cir. 1975), *cert. denied,* 424 U.S. 958, 96 S.Ct. 1435, 47 L.Ed.2d 364 (1976); *Wetzel v. Liberty Mutual Insurance Co., supra,* 508 F.2d at 255–57. The district court expressly found that the named plaintiffs were adequate representatives of the class, as they possessed interests substantially identical to the class members. In addition, the court had authority to require notice if any of the purposes listed in 23(d)(2) were in need of being served. Thus, failure to order prejudgment notice does not invalidate the class action here.

## III. THE MERITS

Avco's Nashville facility is devoted primarily to the manufacture and assembly of aircraft parts. It has also in the recent past manufactured appliances and furniture for brand name distributors. Perhaps typical of the aircraft industry, total employment has fluctuated widely from time to time due to the nature of private subcontractor work on the aircraft projects. Thus, employment rose from 2335 persons in 1966 to 3391 in 1970, only to decline thereafter markedly until by November 15, 1975, only 1509 persons were employed.

Jobs at Avco are grouped into departments and occupations, with departmental lines having had great significance before 1968. Until 1971, occupations consisted of several related job classifications such as A, B, and C categories in a particular craft or operator position, the A position being the most skilled and hence the best-paying. Many occupations were found in several departments throughout the plant. The basic aircraft manufacturing occupation, known as "assembler-bench and jig," had

the largest number of employees in the plant and was the focus of much testimony at trial. In 1971 the A, B, and C categories were abolished and instead the Company used a system of varying pay levels within each occupation with automatic progression over a period of time. Occupations carry pay rates keyed to an hourly wage rate system of labor grades from 11 (the lowest) to 1 (the highest). Certain menial positions, such as janitor, are not in the grade system at all and pay less than the grade 11 rates. Many job rates can vary according to individual or group production output under an incentive system.

Job changes, including promotions, transfers, rollbacks and recalls, were governed until the time of trial by the detailed seniority provisions of the three successive collective bargaining agreements in effect since 1965. There was an overriding requirement that an employee be qualified to perform any particular job in question. The operation of the system is best paraphrased from the description contained in the brief of defendant Avco. In the 1965 contract between Avco and the Union, as in all subsequent labor agreements, seniority is defined as "length of service computed for each employee from his most recent date of employment," meaning the *plant service.* Employees were permitted by the 1965 agreement to bump to other jobs during a reduction in force, but only within a department. In other words, an employee utilized his company hire date, or "plant seniority", to bump other employees from occupations for which he was qualified by prior experience, but he did so only within his department. There was one exception to this pattern. Bumping in the assembler-bench and jig occupation was conducted on a plant-wide basis. Promotions under the 1965 agreement were awarded to qualified lower-classed employees, after first returning prior incumbents holding "equity," on the basis of plant seniority exercised within the department. In all situations, an employee assigned to a new department would compete with other employees of that department for promotional opportunities on the basis of plant seniority.

Major changes were negotiated by Avco and the Union in the seniority system incorporated in the succeeding 1968 collective bargaining agreement. Seniority continued to be defined solely on a plant-wide basis, but bumping privileges in the event of a reduction in force were broadened. Thereafter, an employee could displace a junior employee in a different department in either his current classification or in the last classification which he may have held in the other department, provided the bumping candidate satisfied certain conditions of minimum seniority and of satisfactory service when he sought a previously-held classification. If a bumping employee lacked the minimum seniority required, he could nevertheless displace a less senior employee in a lower classification of the same previously-held occupation.

Further, the scope of exercise of plant seniority was expanded for the purpose of promotion by the 1968 agreement. A new procedure of advanced bidding was instituted, which permitted an employee to compete for any job in the plant for which he was qualified, irrespective of his particular departmental assignment. By filing a "job preference" card, a candidate for promotion could obtain placement, if qualified for the duty, on a job preference list, and thereby would become eligible for automatic promotion in line of plant-wide seniority when an opening became available. Openings not filled by advance bids were required to be posted on bulletin boards for the employees' scrutiny.

The next collective bargaining agreement between the Company and the Union was negotiated in 1971 and was in effect at the time of trial. Bumping privileges during a reduction in force were further expanded, being limited only in essence by a requirement of capability for the relevant work derived through prior service in the occupation in which bumping was desired. Promotional opportunities were improved by an

increase in the number of permissible simultaneous job bids to six instead of the previous limit of three.

The evidence was convincing that prior to July 2, 1965, the effective date of Title VII, discrimination in employment was indeed substantial at Avco. In an area where 14.7% of the work force was black, only 1.3% of the employees of Avco were black in 1961. This increased by 1965 only to 3.6%. During that period those few blacks who were employed served almost exclusively in the lowest paid jobs, as janitors, porters, and charwomen. A self-analysis form furnished to the President's Committee on Equal Employment Opportunity in 1961 showed that Avco had no black foremen, no black skilled or semi-skilled employees, and no black administrative employees. Toilet, eating, and other facilities were segregated by race, and many of those furnished for the use of blacks were inferior. Likewise, Aero Lodge had excluded blacks from membership altogether until 1957. Thereafter, for many years there had been only a token membership of blacks in the Union. The district judge found that the Union had systematically discriminated against its black members in the processing of grievances and in the assignment of duties with respect to Union affairs during this pre-Act period.

Following trial, the district court held that the Company and the Union had violated Title VII by discriminating on the basis of race against the class of black employees by engaging in the following practices:

1) preserving through the seniority and promotion systems past discrimination in the areas of classification as to the types of employment available to black employees, training, working conditions, promotions, transfers, compensation and terminations;

2) failing, through its supervisory personnel, to afford black employees the same training afforded to white employees, thereby effectively excluding black employees from opportunities for advancement to semi-skilled and skilled occupations;

3) considering subjective and racially discriminatory evaluations of its foremen and other supervisory personnel in determining qualifications for advancement without ascertaining whether or not such evaluations were affected with racial bias; and

4) discriminating against black assembler-bench and jig employees in the Globe Wernicke incident.

## A. Perpetuating Past Discrimination

In its opinion the district court found that Avco maintained a departmental seniority system until 1968 and thereafter retained seniority by occupation and classification. However, it is apparent that Avco's system did not employ departmental or occupational seniority in the traditional sense. While departmental units had great significance until 1968, during that period as in all others the measure of seniority was an individual's length of plant-wide service with the Company. On the other hand, the existence of job "equity," which was the preference accorded an employee who had previously performed a particular job, tended to cause the competition for positions to be based in part on considerations akin to those in an occupational seniority system.

The district court, in its opinion, particularly stressed that the job equity feature was primarily responsible for perpetuating pre-Act discrimination. The 1965, 1968, and 1971 contracts all gave an absolute preference in filling a vacancy to employees with prior, satisfactory service in the particular occupation. In other words, whenever a vacancy occurred, all employees having equity in that occupation were given the right to return to that job before it was opened to the promotional bidding system. As among those holding equity, the vacancy would be awarded to the employee with the greatest plant-wide seniority, not the longest period of experience at that job. Simi-

larly, when layoffs were ordered, employees could return to occupations they had formerly held if their current jobs were eliminated. The effect of this system was that an employee with job equity would always be preferred over an employee without job equity, even though the latter was deemed qualified for the position by the Company and had longer plant-wide service.

The plaintiffs complained that this system, though neutral on its face, discriminated against blacks where there had been an historical preference toward whites in awarding the better jobs. By giving absolute priority to those with any experience at Avco in a particular occupation, the Company disproportionately excluded blacks from the selection process, where they had previously been denied that very experience.

The district court decision and the parties' initial briefing on appeal were made without the benefit of the recent Supreme Court pronouncement on Title VII coverage in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed. 396 (1977). There, the Court held that a bona fide seniority system which perpetuates the effects of prior discrimination is immunized from a finding of illegality by reason of § 703(h) of the Civil Rights Act, 42 U.S.C. § 2000e–2(h), which states in part:

> Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority . . . system, . . . provided that such differences are not the result of an intention to discriminate because of race . . . or national origin. . . .

In reaching this conclusion the Court took a substantially different approach to Title VII litigation than had been followed in at least six of the circuits, including our own. *See, e. g., EEOC v. Detroit Edison*, 515 F.2d 301 (6th Cir. 1975), *vacated and remanded in light of Teamsters*, 431 U.S. 951, 97 S.Ct. 2669, 53 L.Ed.2d 267 (1977); *Palmer v. General Mills, Inc.*, 513 F.2d 1040 (6th Cir. 1975); *Head v. Timken Roller Bearing Co.*, 486 F.2d 870 (6th Cir. 1973).

In *Teamsters* the defendant employer was a common carrier of motor freight with nationwide operations. Employees working as "line-drivers" engaged in long distance hauling between the terminals of the company and composed a bargaining unit which was distinct from that representing "city-drivers," who made deliveries within the immediate area of a particular terminal. The Fifth Circuit held that the company and the union had discriminated against black and Spanish-surnamed persons in the hiring process for the lucrative line-driver positions and in using a seniority system that penalized prior victims of discrimination. The Supreme Court agreed that the government had sustained its burden of proving a system-wide pattern or practice of employment discrimination. As for the seniority system, the problem was succinctly described by Mr. Justice Stewart:

> For purposes of calculating benefits, such as vacations, pensions, and other fringe benefits, an employee's seniority under this system runs from the date he joins the company, and takes into account his total service in all jobs and bargaining units. For competitive purposes, however, such as determining the order in which employees may bid for particular jobs, are laid off, or are recalled from layoff, it is bargaining-unit seniority that controls. Thus, a line driver's seniority, for purposes of bidding for particular runs and protection against layoff, takes into account only the length of time he has been a line driver at a particular terminal. The practical effect is that a city driver or serviceman who transfers to a line-driver job must forfeit all the competitive seniority he has accumulated in his previous bargaining unit and start at the bottom of the line-drivers' "board."

The vice of this arrangement, as found by the District Court and the Court of

Appeals, was that it "locked" minority workers into inferior jobs and perpetuated prior discrimination by discouraging transfers to jobs as line drivers. While the disincentive applied to all workers, including whites, it was Negroes and Spanish-surnamed persons who, those courts found, suffered the most because many of them had been denied the equal opportunity to become line drivers when they were initially hired, whereas whites either had not sought or were refused line-driver positions for reasons unrelated to their race or national origin.

The linchpin of the theory embraced by the District Court and the Court of Appeals was that a discriminatee who must forfeit his competitive seniority in order finally to obtain a line-driver job will never be able to "catch up" to the seniority level of his contemporary who was not subject to discrimination. Accordingly, this continued, built-in disadvantage to the prior discriminatee who transfers to a line-driver job was held to constitute a continuing violation of Title VII, for which both the employer and the union who jointly created and maintain the seniority system were liable.

431 U.S. at 343, 97 S.Ct. at 1858–1859 (footnotes omitted).

The Supreme Court candidly admitted that this seniority system did, in fact, perpetuate the effects of discriminatory employment practices that occurred in the pre-Act period. Nevertheless it ruled that § 703(h) immunized such a facially neutral system as long as an intent to discriminate did not enter its adoption and it had been maintained free from any illegal purpose:

> The seniority system in this case is entirely bona fide. It applies equally to all races and ethnic groups. To the extent that it "locks" employees into non-line-driver jobs, it does so for all. The city drivers and servicemen who are discouraged from transferring to line-driver jobs are not all Negroes or Spanish-sur-

named Americans; to the contrary, the overwhelming majority are white. The placing of line drivers in a separate bargaining unit from other employees is rational, in accord with the industry practice, and consistent with NLRB precedents. It is conceded that the seniority system did not have its genesis in racial discrimination, and that it was negotiated and has been maintained free from any illegal purpose. In these circumstances, the single fact that the system extends no retroactive seniority to pre-Act discriminatees does not make it unlawful.

> Because the seniority system was protected by § 703(h), the union's conduct in agreeing to and maintaining the system did not violate Title VII. On remand, the District Court's injunction against the union must be vacated.

431 U.S. at 355, 97 S.Ct. at 1865 (footnotes omitted).

█ Like the Supreme Court in *Teamsters*, we are totally unable to find that the system under attack in the instant case was established or maintained with an intent to discriminate. Like that in *Teamsters*, it applies equally to all races and ethnic groups. To the extent that it " 'locks' employees into . . . jobs, it does so for all."

With regard to the job equity features of the collective bargaining agreements, it could be argued that they are not a facet of the seniority system but a separate element affecting job competition and hence not immune under § 703(h) of the Act. The Act, however, speaks not simply of seniority but of a bona fide seniority . . . system." A preference to those with experience in a given occupation is in a sense limited occupational seniority and we see nothing in the statute or in *Teamsters* to indicate that it should stand on a different footing than traditional plant-wide or departmental seniority. It is a contractual provision neutral on its face and is, in our

view, an integral part of Avco's unique but nonetheless bona fide seniority system.[9]

Therefore we are obliged to hold that in light of *Teamsters*, the district court erroneously concluded that the defendants violated Title VII by utilizing a seniority system, including its job equity feature, that perpetuated pre-Act discrimination.

## B. Globe-Wernicke Incident

The so-called Globe-Wernicke incident was not mentioned in the plaintiffs' complaints, and only became an issue midway through the trial on the merits. While no injunctive relief was specifically directed at remedying the effects of this incident, it is apparent that it loomed large in the court's considerations of the case and thus we are compelled to address it here.

Late in 1971, while Avco's aircraft work force in the assembler-bench and jig classification was expanding, its operation of a furniture manufacturing line for the Globe-Wernicke Company was terminated, and the employees of that division, most of whom had seniority dating back to the 1950's and 1960's, were faced with a layoff. The company's response caused the "incident," which is described in more detail in the district court's opinion. Except as later noted, the findings of fact, while disputed, are not clearly erroneous:

> As background, assembler-bench and jig is an assembly line occupation connected with the Avco airplane contracts. The demand for assembler-bench and jig employees fluctuates substantially, being affected by the completion of one contract and the acquisition of others.
>
> As a result of these fluctuations, these employees are generally the last to be hired and the first to be laid off at Avco. The great percentage of black employees

hired after the effective date of Title VII were hired into this occupation. Seniority is defined as "length of service computed for each employee from his most recent date of employment." Thus, most employees in this occupation tend to accumulate relatively short seniority periods.

In 1971, Avco had projected that there would be a reduction of the assembler-bench and jig work force some months later between the fall of 1971 and January, 1972. However, a strike took place and the completion of a contract was delayed for a few weeks.

In the latter part of 1971, Avco phased out its Globe-Wernicke Division. None of the employees of the Globe-Wernicke Division, white or black, were qualified for the assembler-bench and jig occupation. Under the union contract, these Globe-Wernicke Division employees were not entitled to transfer to assembler-bench and jig, but were to be laid off when the Globe-Wernicke Division was phased out.

Included among the employees to be terminated by reason of the phasing out of the Globe-Wernicke Division were 73 white employees whose seniority dated from 1950 to August 12, 1960. Because of pressure from the defendant union, Avco agreed to initiate a training program to train these employees in the assembler-bench and jig occupation and then hire them into this occupation. The effect of this was to place these 73 white employees ahead of those who had accumulated less than 11 years seniority.

As projected, Avco shortly thereafter had a cutback in personnel in assembler-bench and jig. This resulted in terminating the regular assembler-bench and jig employees and retaining the old Globe-Wernicke employees who had been on assembler-bench and jig only two or three months.

---

**9.** Under the Avco contracts, a long-time black employee, who in the remedy stage might prove himself entitled to preferential consideration for an upgraded job, would on qualifying gain an earlier seniority date, with its attendant benefits, than he would under the departmental seniority system in *Teamsters* and *Texas Motor Freight*. Conversely, see the impact upon less senior employees, many of them black, discussed with respect to the Globe-Wernicke incident, *infra*.

Avco attempted to justify this procedure by asserting that it was hiring bench and jig employees from the street, i.e., new employees or former employees with no seniority. The company and the union felt justified in training its old employees and hiring them instead of actually hiring new employees, even though this violated the collective bargaining contract.

In determining whether or not the defendants discriminated against black employees in the course of the Globe-Wernicke incident, the court must keep in mind the past racial discrimination practiced by both defendants. On this issue, the court finds the following. The procedure utilized violated the collective bargaining agreement in effect. Due to past racial discrimination, most black employees in assembler-bench and jig had very short seniority status. This procedure violated Avco's written affirmative action program. Avco recognized that this procedure would result in the termination of black employees legally entitled to their jobs on assembler-bench and jig. Avco, which had seniority lists in its possession, knew that a great many black employees, entitled to their jobs under the collective bargaining contract, would be terminated as a result of this procedure agreed on by Avco Corporation and Aero Lodge No. 735.

The court will now examine the effect of the procedure. The number of employees in assembler-bench and jig on January 14, 1972, totaled 898, of which 177 were black. Avco admits that at least 52 black employees lost their jobs as a result of this procedure. As of this time, the number of hourly employees at Avco totaled 2319, of which 286 were black.

Thus Avco and Aero Lodge No. 735, by this procedure, eliminated a substantial percentage of Avco's black employees and only a far smaller percentage of Avco's white employees. The sum and substance of their joint action was to state that white employees are entitled to prefer-ence over black employees in the areas of job classification, working conditions, transfers, compensation and termination. The court holds that such activity by Avco Corporation and Aero Lodge No. 735 constituted active and willful racial discrimination against black employees and union members in violation of Title VII of the Civil Rights Act of 1964.

Defendants strenuously urge that the district judge not only misconstrued their intent in retraining and rehiring the laid-off Globe-Wernicke employees, but that his reaction to the incident totally destroyed the reliability and impartiality of his other findings. While we cannot agree with so sweeping a conclusion, the court, profoundly affected by the evidence of the incident, specifically commented, "The protestations of nondiscrimination, and the credibility by (sic) both Avco and Aero Lodge No. 735, were completely negated and destroyed by their actions in the Globe-Wernicke incident."

■ We do not find clearly erroneous the district court's conclusion that Avco had projected a layoff in the assembler-bench and jig occupation and realized that a foreseeable consequence of rehiring the white employees would eventually be a layoff of newer employees, of whom a substantial number were black. The question then remaining is whether such conduct amounts to actionable discrimination.

■ We conclude in the first instance that the district court erred in holding that the rehiring of the Globe-Wernicke employees violated the collective bargaining contract. It is true that no obligation to retrain laid off employees of Avco existed under the collective bargaining contract. Under that agreement Avco was free to go into the open labor market to recruit new workers and to train them for service in the assembler-bench and jig occupation. It is further true that had Avco done so, workers so hired would have had less seniority than those who were ultimately displaced by the

Globe-Wernicke employees. That the retraining and rehiring of the Globe-Wernicke employees was not demanded by the collective bargaining contract, however, is a far cry from holding, as did the trial judge, that the practice violated it. It simply did not. Rather, we conceive the real issue to be whether Avco had a duty to refrain from retraining and hiring recently laid-off and more senior employees in order to protect the interests of newer employees, who enjoyed less seniority but were more racially balanced in their composition.[10]

We are loath to hold that the practice of a company and a union of retraining its older employees so that they could enjoy the benefit of continued employment is discriminatory in nature merely because its implementation tends to affect adversely the racial composition of the company.

In *Waters v. Wisconsin Steel Works*, 502 F.2d 1309 (7th Cir. 1974), *cert. denied*, 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976), the union and the employer amended an earlier severance pay agreement in order to recall three white bricklayers, who had been laid off and had accepted severance pay. The incident occurred on June 15, 1966, and the court had already found that Wisconsin Steel had a past history of racially discriminatory hiring practices. The Seventh Circuit held that the revision of the severance pay agreement, by restoring contractual seniority rights for purposes of recall to the three white bricklayers, was racially discriminatory with respect to plaintiff Waters, a black bricklayer who had temporarily worked for the company, but not as to Samuels, who was a black applicant for the position. It commented:

> We do not doubt that a policy favoring recall of a former employee with experience, even though white, before considering a new black applicant without experience comports with the requirements of Title VII. . . . To that end, we do not perceive any discriminatory impact with respect to Samuels who was a new applicant.

502 F.2d at 1320. We are in agreement and hold that Avco's retraining and rehiring of its laid-off employees did not violate Title VII.

## C. Other Class Violations

The district court concluded that Avco and Aero Lodge discriminated on the basis of race in other employment practices, including preferential training opportunities for white employees and reliance on subjective and discriminatory evaluations made by supervisory personnel. Apparently the court also found that certain features of the promotional system, apart from the seniority system, perpetuated prior discrimination in various areas. There is, of course, no question but that discriminatory operation of a theoretically neutral promotional system can establish Title VII violations. However, we are unsure if the trial judge would have reached the same conclusions as to these additional practices absent his views with respect to the seniority system and the Globe-Wernicke incident.

We note that to some extent in making his findings, the trial judge relied on statistics comparing the percentage of employees at Avco who were black with the percentage of blacks in the general population of

---

10. The most senior Globe-Wernicke employee who was retrained traced his employment back to January 8, 1943. The least senior had been hired August 12, 1960. The average seniority of those employees dated approximately from October, 1954. Hence the average Globe-Wernicke employee had more than 17 years seniority when recalled in 1971 and 1972. Of the 124 assembler-bench and jig employees laid off between March 3, 1972 and April 14, 1972, 52 were black and 72 were white.

None of the retrained Globe-Wernicke employees was black. There was no showing that any black employees in the Globe-Wernicke division were denied an equal opportunity for retraining. The racial composition of this group of employees may well represent, however, the discriminatory hiring practices of Avco before the Act. The possible liability of Avco to these older employees under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*, had they been categorically refused retraining opportunities, was not raised.

the Nashville area. On appeal Avco urged that use of these figures was improper, because they combined employees hired in the pre- and post-Act years and did not reflect the progress made since Title VII was passed. The Company also argued that the relevant figure for comparison purposes was the percentage of blacks in the work force, which was lower than the figure for the general population. There is merit in these contentions. *See Teamsters, supra,* 431 U.S. at 339, 97 S.Ct. 1843, n. 20.

While the plaintiffs introduced into evidence other statistical exhibits segregating post-Act figures that indicated blacks were underrepresented in the better-paying jobs, we do not know if these disparities were significant, especially in light of information submitted by defendants in rebuttal. Likewise, the statistical differences must be discounted to the extent they are simply a reflection of the impact of the bona fide seniority system, including its job equity feature. Since the district court issued its

opinion, the Supreme Court has clarified the probative value to be accorded various kinds of statistical data in Title VII cases. *See Teamsters, supra,* 431 U.S. at 336–342, 97 S.Ct. 1843; *Hazelwood School District v. United States,* —— U.S. ——, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977). *Cf. Castaneda v. Partida,* 430 U.S. 482, 496, 97 S.Ct. 1272, 51 L.Ed.2d 498 n. 17 (1977).

 From the foregoing, we believe the best course is to vacate the order containing injunctive relief and to remand for reconsideration of the class liability issue. The district court should re-evaluate the evidence before it in light of our comments here and of the holding in *Teamsters.*[11] Because of the impact of the recent Supreme Court decisions, we think it only fair that the trial judge be free in his discretion to reopen the proofs to the extent that it is necessary to give the parties an opportunity to present any additional testimony which may have gained relevance in view of the recent cases and of our opinion.

11. The Court explained in *Teamsters*:

> At the initial, "liability stage" of a pattern or practice suit, the Government [plaintiffs' class here] is not required to offer evidence that each person for whom it will ultimately seek relief was the victim of the employer's discriminatory policy. Its burden is to establish a prima facie case that such a policy existed. The burden then shifts to the employer to defeat the prima facie showing of a pattern or practice by demonstrating that the Government's [plaintiffs'] proof is either inaccurate or insignificant. An employer might show, for example, that the claimed discriminatory pattern is a product of pre-Act hiring rather than unlawful post-Act discrimination, or that during the period it is alleged to have pursued a discriminatory policy it made too few employment decisions to justify the inference that it had engaged in a regular practice of discrimination.

431 U.S. at 360, 97 S.Ct. at 1867 (footnote omitted).

The Supreme Court's further description of the procedure is illuminative. The purpose of a pattern or practice action or a class action under Title VII is not simply to benefit blacks generally as against whites; its purpose is to establish in the first instance whether the employer and the union have followed a pattern or practice of unlawful discrimination against the class. This, according to *Teamsters,* entitles the plaintiff class to certain relief which would be uniquely and undeniably class wide and which would not relate to individual benefits. The elimination of generalized discriminatory conduct by way of the grant of injunctive relief is typical of such authority in the court upon a finding of class wide discrimination. Insofar as the individual claims of members of the class are concerned, generally *Teamsters* holds that the benefit from the class determination is that the force of the generalized proof does not dissipate at the remedial stage of the trial. The employer cannot, therefore, claim that there is no reason to believe that its individual employment decisions were discriminatorily based; it has already been shown to have maintained a policy of discriminatory decision-making. Nonetheless at the remedy stage of the hearing where individual relief is sought, it must be individually addressed and resolved. The individual member must then come forward and demonstrate that he is a member of the class and that he has been adversely affected by the practice found discriminatory. He need not show the discriminatory intent of the company or union because that has already been established for the class. He must, however, show that he was a victim of the discrimination found. Once this is shown, and not rebutted by the defendants, the precise remedy is left to the discretion of the trial court acting under traditional equitable principles.

We make no comment concerning what should be the trial court's ultimate conclusions regarding the other employment practices mentioned above. However, the trial court will consider whether, absent consideration of the effects of the seniority system and the Globe-Wernicke incident, the remaining proofs as to one or the other, or both, of the defendants are sufficient to demonstrate by a preponderance of the evidence that unlawful discrimination has been a "regular procedure or policy," rather than an isolated and sporadic occurrence perhaps supporting individual claims of relief but not class-wide charges.

While the preliminary injunctive order must be vacated and while any new remedial order will have to be subjected to its own scrutiny on the record then made, it is not inappropriate to comment on the order lest any of its deficiencies be otherwise perpetuated. A copy of that order is made an addendum to this opinion.

1) The provisions of numbered paragraphs 3, 4 and 5 are overly broad under *Teamsters* at least as they apply in general to black employees without respect to whether any particular employee has in fact shown himself to be aggrieved and to the extent they alter the operation of the seniority system.

2) Paragraph 6 obviously would be inappropriate in view of the determination herein that job equity is a part of the bona fide system of seniority.

3) With respect to paragraph 7, which extended the probationary period for blacks to counter the previous policy of informal on-the-job training preferentially given to whites, we see no abuse of the trial court's discretionary equitable powers in this regard and note particularly that the Supreme Court has recently and specifically approved "catchup" educational programs for black school children similarly disadvantaged. *See Milliken v. Bradley,* —— U.S. ——, —— –——, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977).

4) Paragraph 8 of the order is, in our view, overly broad and inconsistent with the particularized relief contemplated in *Teamsters.* There was no finding by the district court that the union grievance procedure is ineffective for processing the claims of blacks in general.

5) Also, paragraph 13 would appear to be no longer appropriate in view of the *Teamsters* decision.

We make the foregoing observations to be of some assistance to the district court and without indicating what conclusions should be reached on reconsideration.

## IV. INDIVIDUAL CLAIMS

We will proceed to review the merits of the individual claims, because we do not think that a reconsideration of them by the district judge in light of *Teamsters* is necessary

### A. Ramsey Alexander

In his complaint filed January 13, 1966, Ramsey Alexander alleged that his applications for promotions or transfers to brickmason's helper, stationary fireman, and other occupations were denied despite his qualifications, and that white employees with less seniority and fewer qualifications were awarded the positions. The difficulty with his claim is that most of the conduct of which he could justifiably complain occurred before the effective date of the Act. We therefore address only the post-Act claims.

On July 12, 1965 Alexander filed a form requesting consideration for the next opening in the brickmason occupation, and trial testimony focused on this application. He also filed a request for a "better job" in the maintenance department on December 14, 1965, for a job as a stationary fireman on November 23, 1965, and for a job as an oiler on March 26, 1966.

The district court concluded that Alexander had been denied a promotion to the job of brickmason because he lacked certain qualifications, including a knowledge of al-

gebra, geometry, and trigonometry, while no Avco mason had ever possessed such qualifications. In addition he found that the individual eventually hired to fill the position did not possess qualifications equal or superior to those possessed by Alexander. It appears that the court also found that the departmental features of the seniority system before 1968 worked to Alexander's disadvantage, but of course *Teamsters* precludes a violation on this basis.

With respect to his request for employment as a brickmason, the unrefuted evidence was that the one and only position in that occupation remained filled by a longtime employee until July of 1966. Thus there was not in fact and could not have been any vacancy to be filled until that date. In March of that year Alexander had been offered and had accepted a position as an oiler. The uncontradicted testimony demonstrated that the company's standard practice was to cancel any outstanding promotion requests when an employee received a promotion as to any one of them. Thereafter, an employee had to refile the request in order to obtain further consideration for the other positions. When the brickmason opening occurred, Alexander did not have an outstanding request on file, and thus he was not considered for the job. He testified that he understood these promotional procedures at Avco, but he thought he should have been considered by virtue of his pending court suit. There was no indication that this requirement was selectively enforced. The first person thereafter filling the brickmason position was another black employee.

Alexander also claimed that before he was promoted to the position of oiler, he was discriminatorily subjected to written and practical tests, which were never given to other applicants. This is supported adequately by Alexander's testimony, but the difficulty is, of course, that he was promoted to the job and thus suffered no economic injury.

▮ Accordingly, we conclude that in the face of the undisputed evidence, the court erred in deciding that Alexander was subjected to discriminatory post-Act practices by the Company and the Union. After being promoted to oiler, he was aware of the requirement that a new bid be filed for another promotion, but he failed to do so. There was no evidence that he was deterred from filing his application by any conduct of the Company or the Union, or that the Company kept from him the information that the position had become open upon the older employee's death. Neither did the evidence show that he was denied other promotions in the post-Act years on account of his race.

**B. Robert F. Newman**

▮ Upon conflicting evidence, the district court found that Avco was guilty of racial discrimination in discharging plaintiff Newman and in refusing to transfer him to a less strenuous job. Newman claimed that the Company had on other occasions found new jobs for white employees who could not perform the particular assigned work. This finding is not clearly erroneous and the award of benefits is affirmed. Newman's claim that the defendant Union refused to include a charge of racial discrimination in his discharge grievance and otherwise failed to represent him fairly finds sufficient support in the record to require an affirmance of the Union violation also.

**C. Raymond L. Dennis**

The district court found that Avco, but not Aero Lodge, had discriminated against intervenor Dennis by firing him in January, 1971 on the pretextual basis that he had advocated a slow-down among the workers. The real reason, the court found, was the Company's irritation and anger over Dennis' aggressive representation of black employees. At that time Dennis was a union committeeman and had been a board member of an organization known as "The Cause-Find Commission," formed by Avco black employees to eliminate racial discrimination existing at the plant.

■ Upon hotly-disputed evidence, we conclude that the district court findings of Company discrimination are not clearly erroneous. Therefore the order of the district court, insofar as it pertains to the plaintiff Dennis, is affirmed.

Warner McCreary, a black male, and a trainee at the aircraft assembly school intervened as an individual plaintiff in the action. After trial, the court found that his claim of discrimination was without merit, and he has not appealed.

## V. ATTORNEY FEES

■ While defendants have attempted to appeal the district court's award of attorney fees, as contained in its orders of June 3 and June 20, 1975, we decline to pass upon the merits of this question on this interlocutory appeal. The final judgment for attorney fees has not been entered. The district court retains jurisdiction to modify and amend the order upward or downward as the case may be and as may appear appropriate in light of the proceedings on remand.

In particular, the amount may be affected by the extent to which the earlier decision of class wide liability is superseded. If the court should, upon reconsideration, conclude that there is insufficient evidence to establish a pattern or practice suit, a reduction in the award of attorney fees would be appropriate as only the individual claims of Newman and Dennis would be successful. On the other hand, if it should develop upon remand that class wide liability is reaffirmed and that further proceedings as to individual complaints of members of the class are necessary, then no doubt further revision of the attorney fees to reflect this circumstance would be warranted.

Affirmed in part; reversed in part; and remanded to the district court for further proceedings not inconsistent herewith.

## ADDENDUM

### DISTRICT COURT ORDER OF FEBRUARY 11, 1975

A hearing was held in response to a motion to vacate the court's order of August 20, 1974, and for additional findings of fact.

It is ORDERED

(1) So much of the court's memorandum and order of August 20, 1974, which adjudged this cause must not proceed as a class action is hereby set aside and vacated. Said cause shall proceed as a class action as defined in the original memorandum of the court filed on December 18, 1973.

The memorandum and order of the court filed August 20, 1974, is further amended to provide the following relief:

(1) Up-to-date applications, which shall detail all educational background and previous work experience at Avco and elsewhere, will be taken from all black employees. Appropriate officers at Avco shall render good faith assistance to each black employee in eliciting the aforementioned information which shall be kept in a file with the employee's name affixed thereto. No other information, correspondence or documents shall be placed in these files, which shall be adverted to hereafter as the "transfer" files.

(2) Bid procedures currently in effect will be circulated in writing to all black employees.

(3) When an opening occurs within any non-supervisory occupation within the bargaining unit which must be filled by the company, notice thereof shall first be posted on all plant bulletin boards for two (2) consecutive working days to enable qualified black employees to file bids thereon at the Industrial Relations Department on a form which shall be supplied by the company. Only black employees shall be eligible to file such bids. No such opening shall be filled through the application of any of the recall or promotion provisions of any applicable collective bargaining agreement between the company and the union, unless no qualified black employee files a bid in accordance with the procedures specified in this Paragraph (3).

(4) At the close of the posting period provided for in Paragraph (3) above, any bids filed by qualified black employees prior

to such closing in response to such notice shall be considered together with the claims of all other qualified employees, regardless of race or color, who are then holding placement on the job preference list for the occupation in question under the then current promotion provisions of the seniority article contained in the applicable collective bargaining agreement between the company and the union. The opening shall be awarded to the employee among such number who has the greatest amount of plant-wide seniority.

(5) Blacks may bid on all job openings based on plant-wide seniority without the contract limitation of occupational seniority. There shall be no limitation on the number of bids which may be filed by any black employee in accordance with Paragraph (3) above. Upon receipt of a bid from a black employee, the appropriate company "employee" (defined and designated, *infra*, Paragraph (9)) shall examine only the "transfer" file of such employee to determine the applicant's qualifications for the job opening. No other information, evaluation, opinion or documentation shall be received or used by said company employee in ascertaining the fitness of the bidder.

(6) In the implementation of the provisions of Paragraph (4) above, the company employee shall review only those up-to-date application forms of white employees which are similar to those of black employees in the "transfer" file. Any other information, evaluation, opinion or documentation is strictly prohibited from review by said company employee in deciding between the black and white applicants.

Job equity is hereby eliminated as a factor in the aforesaid determination; but the provisions of this Paragraph (6) shall not be deemed to prohibit the application of job equity as a factor in the event an opening cannot be filled under the procedures specified hereinabove. The previous experience of an applicant, however, as reflected on an up-to-date application form, may be considered in the evaluation by the company employee as to whether any claimant possesses the necessary qualifications for the duties of the occupation in question.

(7) To offset the previous policy of informal on the job training previously given to whites, but not to blacks, when a black employee is awarded a job opening hereunder, he shall be afforded a probationary period which shall be twice as long as the probationary period customarily and normally accorded to employees in the same occupation prior to the date of entry of this order. During such probationary period the black employee shall be given a fair and representative opportunity to demonstrate his qualifications to perform the duties required, and he shall be given all such familiarization and instruction as has heretofore been normally accorded to white employees during probationary periods in such occupation. Such familiarization and instruction shall be made available in good faith to the black employee by the immediate supervisory personnel in the department in which the opening occurs. If the black employee has not satisfied the job requirements within such double probationary period, he shall be returned to his former position without loss of seniority and with all rights unimpaired, subject to the grievance procedure hereinafter set forth in Paragraph (8).

(8) When a black employee asserts that the foregoing steps have not been properly implemented or alleges that he is the subject of any racially discriminatory treatment, he may file a written grievance which sets forth his complaints against Avco through the company employee. Avco shall have five (5) days within which to evaluate the grievance. If the company determines that the grievance is proper, it must remedy the situation. If the company rejects the grievance, it shall notify the complainant in writing of its conclusion within five (5) days after the grievance was filed. Concomitantly, Avco shall also request in writing that the Federal Mediation and Conciliation Service submit a panel of

five arbitrators. On receipt of the designation of the panel, the company shall submit said list of panelists to the complainant. Within three (3) days thereafter, the complainant shall deliver a written statement to Avco in which the complainant selects one member of the designated panel to hear the grievance.

At the hearing, the company, the union, the complainant and his attorney, if any, may appear to submit evidence and argue the issues. A copy of the memorandum opinion of this court filed December 18, 1973, and a copy of this particular order shall be furnished to the arbitrator. The decision of the arbitrator, if supported by substantial evidence, shall be final and conclusive as to the company, the union and the complainant.

(9) The "company employee" adverted to hereinbefore, may be any employee of the company who is not an officer, stockholder, director, and who was not a witness in the trial of this lawsuit.

(10) The above plan will remain in effect for one year. The company shall file with the court within thirty (30) days from the date of this order documents reflecting the total number of non-supervisory employees, their job classifications, their race and the number and percentage of blacks in each job classification. A similar report shall be filed at three-month intervals thereafter. A review of Avco's progress in alleviating racial discrimination will be held by the court subsequent to the filing of the fourth quarterly report by said company. On application of any party, the court may consider an earlier review.

(11) The provisions of the existing collective bargaining agreement and those of any future agreements between the company and the union are not binding if their enforcement is contrary to the provisions of this order or if the enforcement would result in discrimination against any black employee.

(12) The defendant Avco is enjoined and restrained from racial discrimination of any kind in the classification, transfer, promotion or termination of its employees.

(13) As to any future cut backs or reduction in force which may occur within a period of six months (6) months from the entry of this order, in determining whether or not black employees shall be laid off, the company shall, in applying its seniority provisions of its collective bargaining agreement, retain or lay off blacks based on plant wide seniority instead of occupational seniority.

It is ORDERED that the defendant Avco shall furnish to counsel of plaintiffs within thirty (30) days from the date of entry of this order, the names and addresses of all employees of the class which they have in their possession and which are available to them. The defendant Avco shall likewise post a copy of the Notice (Appendix A) for a period of sixty (60) days on the bulletin boards throughout the plant and buildings of Avco and the defendant Aero Lodge shall post a copy of the said Notice at the office and operations building of said Lodge.

It is further ORDERED that upon receipt of said names and addresses from defendants, the plaintiffs will mail or cause to be mailed by regular mail to each such individually identified member of said class as defined in this order, a copy of said Notice (Appendix A). This mailing will be at plaintiff's expense.

In order to give notice to prospective black employees and members of the defendants who are or may be members of said class the plaintiffs will publish at their expense four (4) consecutive weekly publications in a newspaper of general circulation in Davidson County, Tennessee, of said annexed Notice (Appendix A).

It is further ORDERED that the defendant Avco and Aero Lodge No. 735 immediately implement the provisions of this order.

It is further ORDERED that a hearing will be held in this cause on March 7, 1975, to determine amounts due the plaintiffs Robert F. Newman, Ramsey Alexander and Raymond L. Dennis and the amount of attorney's fees for said plaintiffs.

The case will remain on the active docket and jurisdiction is retained and all other matters are reserved.

/s/ L. CLURE MORTON
UNITED STATES DISTRICT
JUDGE

EDWARDS, Circuit Judge, concurring in part and dissenting in part.

Like my colleagues, I recognize that the Supreme Court's opinion in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), requires our remand of this case to the United States District Judge for his reconsideration. In *Teamsters* the Supreme Court noted: "It is conceded that the seniority system did not have its genesis in racial discrimination, and that it was negotiated and has been maintained free from any illegal purpose." *Id.* at 431 U.S. at 356, 97 S.Ct. at 1865. I do not find any such concession in this record and I assume that the trial judge is free to make his own original determination as to whether or not the seniority system had "its genesis in racial discrimination" and whether or not "it was negotiated and has been maintained free from any illegal purpose."

Additionally, I disagree with my colleagues' analysis of the Globe-Wernicke matter. No matter how desirable a general policy of training laid-off employees for future job opportunities in their former employer's plant might be, if, as the District Judge appears to have held here, it is done for the first time in the history of the company in a situation where the company's past employment policy was clearly discriminatory to black employees and the company knows that the new program will have the result of eliminating 52 out of the total 286 black employees in the plant, in my view the Judge was not clearly erroneous in finding the practice to be discriminatory.