Ivory Lee SANDERS, Individually and on behalf of all others similarly situated having been discriminated against by defendant because of their race and color in connection with employment, opportunities for employment, or conditions of employment, Plaintiff,

v.

The SHERWIN WILLIAMS COMPANY, Acme Quality Paints Division, Defendant.

Civ. No. 75–71836.

United States District Court, E. D. Michigan, S. D.

July 18, 1980.

Roger E. Craig, William D. Haynes, Detroit, Mich., for plaintiff.

Dan Wyllie, Mark Sutton, Detroit, Mich., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ANNA DIGGS TAYLOR, District Judge.

Plaintiff, a black employee of the defendant, filed the complaint in this action on September 22, 1975, on behalf of himself and all others similarly situated, alleging racial discrimination in employment in violation of 42 U.S.C. § 2000e et seq., and § 1981. A Right-to-Sue letter, from the United States Equal Employment Opportunity Commission dated June 23, 1975, was attached as an exhibit thereto. Plaintiff alleged his representation of a class of all black persons whom defendant had discriminatorily refused to hire, had discharged, or had discriminated against with respect to terms and conditions of employment, in-

cluding promotional and transfer opportunities. He requested declaratory and injunctive relief, as well as compensatory and punitive damages.

After unsuccessful motions to dismiss both class and individual claims, defendant filed its answer and a jury demand on May 21, 1976, denying all violations of the law. The court finds that its jurisdiction of this matter is proper.

On August 12, 1977, the Honorable Damon J. Keith entered the court's order certifying a class:

" . . . consisting of all blacks presently employed or who have been employed by defendant at its Acme Quality Paints Division on or after September 22, 1972 (under 42 U.S.C. § 1981) or December 22, 1973 (under Title VII of the Civil Rights Act of 1964, as amended) who have been discriminated against with respect to compensation, terms, conditions, and/or terms of employment."

The court, in its certification order, specifically rejected persons not hired, or alleged to have been terminated, from inclusion in the class. The date of September 22, 1972, was determined as the commencement of plaintiff's § 1981 case because of the applicability of Michigan's three-year statute of limitations against all prior events: and the time limitations of Title VII itself determined December 22, 1973, to be the commencement of plaintiff's Title VII case. See *United Air Lines v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977).

Trial was had to the court for ten days commencing April 29, 1980. Prior to trial, sua sponte, this court struck defendant's jury demand and plaintiff's demand for punitive damages, on authority of *E.E.O.C. v. Detroit Edison*, 515 F.2d 301 (6th Cir. 1975).

At the close of plaintiff's case, defendant moved to dismiss, pursuant to Rule 41(b) of the Federal Rules of Civil Procedure, on the grounds that, on the facts and the law, the plaintiff had shown no right to relief. The court requested briefs, and took the motion under advisement. These findings and con-

clusions are hereby promulgated in accordance with that Rule. See *Frausto v. Legal Aid Society of San Diego, Inc.,* 563 F.2d 1324 (9th Cir. 1977); *Ash v. Hobart Mfg. Co.,* 483 F.2d 289 (6th Cir. 1973).

Plaintiff's claims are of discrimination by disparate treatment of himself and his fellow class members, as well as by the disparate impact of facially neutral practices in job placement, transfers and promotions, discipline, and work and overtime assignments.

In a claim of disparate treatment, a Title VII plaintiff must prove a prima facie case by a preponderance of the evidence (quite aside from the Rule 41(b) standard of a prima facie case which will be discussed below), which "consists of facts sufficient to sustain the inference that the challenged action of the employer was motivated by impermissible considerations." *Mosby v. Webster College,* 563 F.2d 901 (8th Cir. 1977). The well-known four part test of *McDonnel Douglas Corporation v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 2951, 36 L.Ed.2d 668 (1971) is to be applied. A prima facie case may also be made by "proof of actions taken by the employer from which we infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not those actions were bottomed on impermissible considerations." *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 579, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978). The same standard is applicable to a plaintiff's claim under 42 U.S.C. § 1981.

In a disparate treatment class action, the prima facie case must also include a demonstration, by a preponderance of all evidence, that defendant has engaged in a pattern or practice of discrimination applicable to the class as a whole. Such proof requires more than the mere occurrence of isolated, accidental, or sporadic discriminatory acts. It requires proofs that discrimination was the defendant's "standard operating procedure." *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

A disparate impact claim is still governed by the law of *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), except, as discussed infra, the rule of that case has been narrowed by *Teamsters, supra.* As the court differentiated the two theories in *Teamsters*:

. . . "Disparate treatment" such as is alleged in the present case is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex or national origin. *Proof of discriminatory motive is critical,* although it can in some situations be inferred from the mere fact of differences in treatment. . . . Claims of disparate treatment may be distinguished from claims that stress "disparate impact". The latter involved employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity. See infra, at 1861. Proof of discriminatory motive, we have held, is not required under a disparate-impact theory. 431 U.S. at 335 n. 15, 97 S.Ct. at 1854 n. 15, (Emphasis added.)

A critical factor to a prima facie case in disparate impact cases is the need to identify the particular practice or device in question and to establish a causal relationship between that practice and the statistical disparity which is alleged to have resulted. As outlined by the Court in *Neloms v. Southwestern Electric Power Co.,* 440 F.Supp. 1353, 1369–70 (W.D.La.1977):

The statistics used to buttress a claim should relate to the particular employment practice at issue. For example, if the plaintiff is attacking hiring policies, he should show the disparity in hiring rather than statistics concerning the general composition of the work force. See *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *Crocker v. Boeing Co.,* 437 F.Supp. 1138 (E.D.Pa. 1977).

In attacking a specific practice or selection device, the plaintiff may prove the

**574**

discriminatory effect of the practice or device by the use of statistics. . . . The burden only shifts, however, once the plaintiff has shown the disparate impact of the particular test or device in question. *Albermarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975); *James v. Stockham Valves & Fittings Co.*, 559 F.2d 310 (5th Cir. 1977); *United States v. Georgia Power Co.*, 474 F.2d 906, 911 (5th Cir. 1973). . . . In other words, the mere disparity, without some causal connection, is not sufficient to shift the burden of proof to the defendant. There must be some proof that the disparity resulted from the practice or device in question. See *United States v. Georgia Power Co.*, 474 F.2d 906, 912 n. 5 (5th Cir. 1973).

When a court concludes that a Title VII (and 42 U.S.C. § 1981) plaintiff has proved a prima facie case of either disparate treatment or impact, then the court must consider defendant's explanation or justification for the presumptively discriminatory action or practice. The type of defense that the defendant must then prove depends upon the type of claim asserted by the Plaintiff. In a disparate treatment case, the defendant must prove "a legitimate nondiscriminatory reason" for his action. *McDonnell Douglas supra*. In a disparate impact case, the defendant must prove that the challenged test, procedure, or requirement, bears "a manifest relation to the employment in question." *Dothard v. Rawlinson*, 433 U.S. 321, 329, 97 S.Ct. 2720, 2727, 53 L.Ed.2d 786 (1977), quoting *Griggs, supra*; unless the procedure in question is encompassed within a statutory exception. See *Teamsters, supra*. In either case, the burden of going forward is then placed upon the defendant to present such a defense.

After both parties have met their above-described burdens, the plaintiff may still prevail if he can, finally, prove by a preponderance of the evidence that the apparently nondiscriminatory rationale established by the defendant served only as a pretext for the in fact discriminatory acts or practices in question.

Despite the three part allocation of proofs in a Title VII and 42 U.S.C. § 1981 lawsuit, a court is not precluded from consideration of a defendant's Rule 41(b) motion at the close of plaintiff's case. If a plaintiff's evidence fails to establish a prima facie case by a preponderance of the evidence; or if testimony adduced from plaintiff's own witnesses and the documentary evidence introduced by plaintiff establish by a preponderance of the evidence either a "legitimate, nondiscriminatory reason", or a "business necessity" defense, and plaintiff's evidence does not establish by a preponderance that defendant's justifications were pretextual, the granting of defendant's Rule 41(b) motion is appropriate. · See *Frausto, supra*; and *Sime v. Trustees of California State Univ. and Colleges*, 526 F.2d 1112 (9th Cir. 1975).

This court must first note, before entering upon the merits of this cause, that plaintiff Sanders and the other witnesses who testified on behalf of the class represent the generation of black Americans who started their careers long before enactment of Title VII of the Civil Rights Act of 1964, and who have been irreparably injured by our tragic history of pervasive and invidious racial discrimination in employment in this country. The most senior among them commenced work at the Acme Quality Paint Company in 1943, and all but the youngest testified to the humiliations of separate drinking fountains, lockers, and bathrooms; exclusion of blacks from the cafeteria and bowling teams; racially derogatory remarks by supervision, and all of the other indices of patently disparate treatment which this court well knows to be part of our unfortunate history. But the court may not here adjudicate the faults and liabilities attaching to that history. The court here is limited to the adjudication of the claim that, since September 22, 1972, defendant has engaged in a pattern and practice of invidious racial discrimination in "compensation, terms, conditions, and/or terms of employment." Mr. James Allen testified that separate facilities were all abolished in the 1950's, and that the presi-

dent of the bowling league was a black man, by 1971. The college scholarship program for children of employees, from which blacks were also excluded, was abolished in the late 1960's. Finally, the evidence is clear that the Acme Quality Paint Company had become an operating division of the Sherwin Williams Company by 1969; that an entirely new cast of characters assumed control of the plant in which plaintiffs were employed; and that in fact the Detroit plant then fell under the ultimate direction of corporate personnel based in Cleveland, Ohio, who traveled therefrom for resolution of all significant problems, including fourth-step grievance hearings. No racially derogatory remark has been attributed to any member of the new management team, local or corporate, on this record. Those matters can therefore only be recognized as part of an unfortunate past.

This court finds, after a very close examination of plaintiff's case, that plaintiff has failed to make a prima facie case on a preponderance of the evidence, under the applicable law. Moreover, even if the law were as plaintiff mistakenly argues it to be, he has failed to present facts constituting a prima facie case under his own theory. Accordingly, defendant's motion to dismiss must be granted.

*DISPARATE IMPACT:*

Plaintiff argues that the facially neutral seniority system, which has been incorporated into the collective bargaining agreements to which defendant has been a party since at least 1952, has, application, resulted in locking blacks into lower paying jobs in defendant's most disfavored department: the Paint Department. Therefore, Plaintiff argues, unlawfully disparate impact in placement, transfers, and promotions has resulted from defendant's initially discriminatory job placement policies. Plaintiff argues that the *Griggs* case, *supra*, compels a finding of liability on this basis.

First, the court notes that the only evidence of initial placement in the record is the testimony of plaintiff's thirteen witnesses as to their personal job histories. The most recent of those was Walter Wall-ington, who was hired in 1965. Their initial assignments were as follows:

| | |
|---|---|
| Lytle: 1951 | — Receiving Dept. |
| Wallington: 1965 | — Filling and Finishing Dept. |
| Dora Allen: 1962 | — Filling and Finishing Dept. |
| Shaw: 1944 | — Receiving Dept. |
| Prysock: 1947 | — Receiving Dept. |
| Galloway: 1951 | — Janitors Dept. |
| Mitchell: 1944 | — Receiving Dept. |
| Watson: 1950 | — Kem Tone Dept. |
| Hargrove: 1965 | — Finishing Dept. |
| Page: 1951 | — Receiving Dept. |
| James Allen: 1943 | — Drum Cleaning Dept. |
| Doyle Walker: 1953 | — Finishing Dept. |
| Ivory Sanders: 1943 | — Paint Dept. |

Accordingly, only one member of the plaintiff class, Plaintiff Sanders himself, is demonstrated by this record to have been initially assigned to the Paint Department.

Moreover, although plaintiff strenuously argues the "disfavored status" of the Paint Department, the court finds that the only evidence of record indicates the contrary. Plaintiff Sanders himself testified that *all* jobs in the plant were dirty and unpleasant, and his work history indicates that he utilized contractual procedures to bid out of and *back into* the Paint Department, as jobs at the highest hourly rates opened therein. Mr. Doyle Walker testified that the Paint Department consisted of the dirtiest and least desirable jobs. However, although he himself had been initially assigned to the Finishing Department in 1953, he bid into the Paint Department and had attained its highest classification, Tinter A, by 1960. Since 1972, he has never bid for any job outside that department.

Mr. Walker also testified, and plaintiff argues, that blacks were foreclosed from the best jobs in the plant, which were, according to Mr. Walker, in the Filling and Finishing Department. However, Mr. Walker and three other of plaintiff's own witnesses started their careers in Filling and Finishing. Mr. Wallington, like Mr. Walker, bid from there into the Paint Department within his first year of work.

The court further notes that by 1973 the highest pay rates in the Filling and Finishing Department were lower than two of the comparable three in the Paint Department, and that blacks in filling and finishing held

26 of the 45 highest paying jobs there, according to the 1973 seniority list which is in evidence. Accordingly, the court finds that there was no discriminatory initial placement into the Paint Department, and that the presence in 1977 of a high percentage of blacks in that department cannot be the result of their having been locked therein.

The "statistics" in this case, which consist of no more than the seniority lists which have been placed in evidence, indicate that 36 of the 50 employees in the Paint Department were black, in 1977. Every single one of them, on the evidence in this record, could only have been there at that time because he had utilized the contractual bidding procedures to get there. The court must conclude, therefore, that the higher pay rates in the Paint Department (which are evinced by the collective bargaining agreements in evidence) rendered it more favored than "disfavored", and that blacks have successfully utilized the contractual bidding procedure to move among departments.

The court notes that the Maintenance Department appears from the exhibits to have paid at some of the highest rates in the plant, for hourly workers, because of its inclusion of several skilled trades classifications. However, plaintiff presented no evidence whatsoever of any attempt by a black to obtain a skilled trades position since Walter Wallington bid for millwright assistant in 1969. His testimony was that a white who had worked in a garage, and of whose qualifications he had no further information, had won the job. The seniority lists indicate that maintenance was 23.08% black in 1973; and Wallington's further testimony was that his brother had become a skilled tradesman in that department during the 1960's. Accordingly, the facially neutral seniority system has not been demonstrated by a preponderance of the evidence to have disparately impacted, in application, upon blacks.

The status of such a system as a matter of law must also be noted. The Joint Final Pretrial Order in this case lists as ¶ 19, the following uncontested fact:

The seniority system as contained in the various contracts between defendant and Local 7–496 of the Oil, Chemical and Atomic Workers International Union during the relevant time periods was a racially neutral, bona fide seniority system on its face.

Also, ¶ 12 of uncontested facts states:

At all times during the subject of this lawsuit, there was a collective bargaining agreement between defendant and Local 7–496 of the Oil, Chemical and Atomic Workers International Union.

Plaintiff's witnesses Sanders and Allen testified that labor contracts prior to 1952 had provided for departmental seniority and no job bidding system. However, after a 105 day strike in 1952, the union won its first contract with defendant to include plantwide seniority and a plantwide job bidding system. The local union, incidentally, has included within its leadership during these years six of plaintiff's 13 witnesses, who served over the years in offices ranging from Vice-President and Acting President (plaintiff Sanders) to Chief steward, committeeman, and steward.

Defendant's exhibits one through five are the labor contracts for the years between June, 1967, and the plant closing in July of 1977.

Under the contracts, all hourly positions, with three exceptions, were required to be filled by a job posting system whereby notice of any vacancy was posted throughout the plant. All hourly employees, regardless of their current department, could bid on any such vacancy. Under the system, the job was to be awarded to the most senior employee bidding on the job from the department unless there was another departmental employee bidding with "significantly greater qualifications." If there were no successful bidders from the department in question, the job was awarded to the most senior, non-departmental employee bidding, again subject to the significantly greater qualifications exemption. If any employee successfully transferred from one department to another, after five (5) days in the

new department, his total accumulated union seniority would be transferred for all future purposes. Additionally, an employee who transferred jobs or departments under the job bidding system could return to his old job or department within five (5) days without any loss of departmental seniority.

The contracts provided that "An employee's qualification shall be based upon his experience on closely related jobs and on his skill, ability to perform the work and physical fitness as previously demonstrated."

The three exceptions were the skilled positions of varnish cooker, tinter A and tinter B. Those positions were filled by the defendant based upon qualification without regard to seniority or the job posting systems. However, abuses were subject to the grievance procedure.

Moreover, defendant's exhibits 2, 3 and 4, the contracts effective from June, 1970 to plant closing, further provided at Article VI that:

2. Any experience gained on a temporary job by an employee shall not be used against a senior employee under this paragraph if the senior employee was not given an opportunity to gain experience on the job in question.

Plaintiff Sanders testified to the negotiation of this latter language which he called "the Sanders Clause", in 1970.

This court finds, accordingly, that the defendant's seniority system is bona fide, and is racially neutral on its face as the parties have stipulated, as well as in application and operation.

§ 703(h) of Title VII, 42 U.S.C.A. § 2000e–2(h), expressly provides that it is not unlawful for an employer to apply different terms, conditions or privileges of employment "pursuant to a bona fide seniority . . . system . . . provided that such differences are not the result of an intention to discriminate because of race. . . ."

To the extent that the seniority system in this case has perpetuated any effects of past discrimination (and this court finds that it does not) or to the extent that promotions, transfers, job placement or other employment decisions after September 22, 1972 were made pursuant to the seniority system, § 703(h), the parties' stipulation, and this court's findings of bona fides, preclude relief. That conclusion was well settled in *Teamsters, supra,* 431 U.S. at 352–354, 97 S.Ct. at 1863–1864.

In *Teamsters,* the Court held that conduct which occurred prior to the effective date of Title VII could not afford the basis of relief under Title VII. In *Evans,* decided the same day as *Teamsters,* the Court further held that conduct occurring more than 180 days prior to the filing of an EEOC charge also could not be the basis of relief. The court also clearly held that the fact that the plaintiff was suffering the continuing consequences of a time-barred act of discrimination does not afford the basis for relief. In *Evans,* the plaintiff had been discharged as a result of past discrimination. While she was subsequently reinstated, the fact of her discharge and subsequent reinstatement resulted in lower fringe benefits than she would have received had there been no discrimination. In rejecting her claim that this constituted a continuing violation, the Court stated:

Respondent emphasizes the fact that she has alleged a *continuing* violation. United's seniority system does indeed have a continuing impact on her pay and fringe benefits. But the emphasis should not be placed on mere continuity; the critical question is whether any present *violation* exists. 431 U.S. at 558, 97 S.Ct. at 1889. (Emphasis supplied by Court).

The Sixth Circuit has recently interpreted *Evans* as squarely rejecting the argument that the continuing effects of a time-barred violation affords the basis for relief. In *Trabucco v. Delta Air Lines,* 590 F.2d 315 (6th Cir. 1979), plaintiff alleged that a job reclassification which occurred more than 180 days prior to the filing of an EEOC charge could be the basis of relief on the ground that she continued to suffer the consequences in the form of lower wages and fringe benefits. In affirming a dismissal of the claim, the Sixth Circuit held:

We believe that this court is governed by the Supreme Court's recent decision in *United Air Lines, Inc. v. Evans*, 431 U.S. 553 [, 97 S.Ct. 1885, 52 L.Ed.2d 571] (1977). . . .

*Teamsters* has been followed and applied by the Sixth Circuit in rejecting claims based on Title VII in at least three recent decisions: *Rice v. Gates Rubber Co.*, 584 F.2d 135 (6th Cir. 1978); *Wiggins v. Spector Freight Systems, Inc.*, 583 F.2d 882 (6th Cir. 1978); and *Alexander v. Aero Lodge No. 735*, 565 F.2d 1364 (6th Cir. 1977).

In *Alexander*, one of the features of the contractual seniority system was a job equity provision which gave special preference to employees in a given job. The Sixth Circuit held that *Teamsters* and § 703(h) protects all facets of a bona fide seniority system.

> The Act, however, speaks not simply of seniority but of a bona fide seniority . . system. A preference to those with experience in a given occupation is in a sense limited occupational seniority and we see nothing in the statute or in *Teamsters* to indicate that it should stand on a different footing than traditional plant-wide or departmental seniority. 565 F.2d at 1378–79.

In *Rice*, the Court held that a claim of discrimination based upon job promotions, transfers and placement could not be sustained absent evidence that such employment decisions were made in violation of the seniority system:

> The district court agreed that the statistical data reflected discrimination in hiring, promotions and transfers prior to the effective date of Title VII. However, the court further found that "[w]ithin the *definition of the class in the instant case* from 1966 to date of trial, there is no evidence that blacks were not transferred and promoted in strict accordance with the collective bargaining agreement." (Emphasis in original).

The determination of the district court that the plaintiff had failed to establish discrimination in transfers and job placement decisions governed by the seniority system is supported by the decision of the Supreme Court in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 94 S.Ct. 1843, 52 L.Ed.2d 396 (1977). 584 F.2d at 136.

The futility of plaintiff's attack on defendant's promotional, transfer and placement system is expressed by the Ohio District Court in *Griffen v. Cooperweld Steel Corp.*, 22 F.E.P Cases 1113, 1117 (N.D.Ohio 1979):

> It may be fairly assumed that when plaintiff was first hired by Cooperweld, and for many years thereafter, black employees were (if hired at all) routinely assigned to the hardest, dirtiest and lowest-paying jobs. However, it is equally clear that by November of 1969, the most important determinant of the conditions of plaintiff's employment was his relative standing (concededly controlled in large part by past discriminatory job assignments) in various seniority lists and job progressions. Therefore, this case is squarely governed by the principle laid down in *Teamsters* . . . .

Defendant's contractual seniority system, it should be emphasized, does not as a matter of fact, perpetuate prior discrimination. Plaintiff's arguments to the contrary are totally unsupported by the evidence which he has produced. Defendant's 1973 seniority list demonstrates that, at a time when 40.93% of its hourly employees were black, 53% of those in the highest pay classifications plantwide were black. Conversely, 62% of the lowest classifications were held by whites. Every one of plaintiff's thirteen witnesses utilized the job bidding system freely and successfully, horizontally among departments, vertically within, and diagonally from one to a higher classification of another. Not one witness testified to any inability to change departments: and Doyle Walker testified that many employees, black and white, transferred in and out of the paint department between 1972 and 1977. Not one witness lost any promotional opportunity to a white competitor, in violation of this system. James Allen testified that he won every job that he sought since

1943. Although plaintiff's counsel has argued that whites were permitted to attain "qualifications" in temporary assignments, there is no such evidence; and such action clearly would have violated the union contracts.

The record further indicates that the collective bargaining agreements governing these parties were policed with extraordinary vigor by the members of the plaintiff class. Over sixty grievance files were put into evidence, some of which had gone as far as arbitration. Although the contracts contained Articles prohibiting discrimination, not one grievance was filed thereunder. Grievances were all resolved to the satisfaction of, or dropped by, the union, and in the instances where the witnesses were able to recall the races of all involved, no pattern of racial application of contractual provisions was reflected.

DISPARATE TREATMENT:

Although the memories of plaintiff's witnesses were vivid of gross disparities of treatment through the 1940's, 1950's and 1960's, the events of the 1970's could only be recalled by their reliance upon the grievance files and seniority lists which defendant had produced for trial. Plaintiff's witnesses were, moreover, frequently contradicted by the acknowledged written records of the events in which they participated; and they were uniformly unaware of the facts as to whether any perceived adverse treatment they had sustained was, in fact, *disparate* from defendant's treatment of similarly situated whites. It must again be recalled that, as the *Teamsters* court held, a pattern and practice case must be made by a showing, by a preponderance of the evidence, that discrimination was the *standard operating procedure*. This court finds that plaintiff here has not made such a showing.

Although plaintiff has presented no statistics concerning those promotions which defendant was permitted to make outside of the above-discussed collective bargaining agreement provisions, the evidence is clear that no pattern of discrimination is present in that area. Defendant made no promotions to foreman between 1972 and the clos-

ing of the plant in 1977. Between 1967 and 1972, only four promotions to foreman appear in the evidence, and all four were black. Mr. Wallington also rejected a foreman's job in 1967; and Mr. Sanders quit his, to return to the hourly force for higher net earnings. Only one vacancy in upper management between September, 1972 and plant closing is mentioned in the record: that was the position of Production Manager, the second highest in the plant, and was filled by Mr. Melvin Gross, a black. A black salaried chemist appears to have been hired during the mid-60's, and Mr. Allen testified to the employment of several blacks as laboratory technicians. Mr. Allen also testified that, due to his "one man crusade", black secretaries were first hired in unspecified numbers on the office staff in 1964.

The hourly jobs in which defendant had discretion to make selections by qualifications included Tinter and Varnish Cooker. The Tinter Job, the highest paid production job in the plant, was held by Mr. Allen from 1965, and Mr. Walker at the "B" level in 1955, and at "A" level by 1960. Mr. Allen testified that, by the mid-60's every job in the plant was open. There is no evidence of one failure of any job qualification test since 1972, with the exception of Mr. Sanders' delay in obtaining the forklift operator's position pending his medical clearance for peripheral vision, as required by OSHA.

Although there is no claim of hiring discrimination before the court, plaintiff has asked the court to take notice of the Sixth Circuit opinion in *D.P.O.A. v. Young*, 608 F.2d 671, 688, (6th Cir. 1979) in which the district court's findings that the population of the City of Detroit was 43.7% black, and the City of Detroit labor market was 45.8% black, in 1970, were noted. Plaintiff then asks this court to note the affidavit of defendant's personnel director William Rostello of May 20, 1976, which was attached to defendant's Answer in this lawsuit. That affidavit states that 28% of defendant's classified employees at its Detroit facility are black. Plaintiff asks the court to find, based upon those percentages, that a pat-

tern and practice of disparate treatment in terms and conditions of employment has been established. For a number of reasons, the court cannot do so.

First, the court must state that the "statistics" upon which plaintiff here relies would not evidence a pattern of *hiring* discrimination, if such a claim were before the court: and the *D.P.O.A.* court found such figures relevant only to a suggestion of *hiring* discrimination.

Defendant argues that the 28% figure attached to its answer includes all of its classified workers at the Detroit plant, from management, professional, technical, and sales personnel down to the clericals and the hourly production personnel whose circumstances plaintiff has addressed, exclusively, in its case.

The court also notes that, of the hourly employees apparently represented by plaintiff, defendant's Exhibit 26, the July 1973 seniority list, reports that 40.93% of a total of 259 hourly workers were black. Defendant's exhibit 29, the August 1976 seniority list, reports that 43.98% of a total of 166 hourly workers were black; and defendant's exhibit 30, the January 1977 seniority list, reports that 44% of a total of 152 hourly workers were black.

Although there is no evidence whatsoever in this record as to what the positions or qualifications are which constitute the universe of which plaintiff seeks this court's finding of 28% black participation in 1976, this court will accept that argument, arguendo. Nevertheless, plaintiff has not presented a suggestion of hiring discrimination, without more.

In *D.P.O.A. v. Young, supra,* on which plaintiff relies, the Sixth Circuit held that municipal population and labor force statistics are a relevant comparison, for resolution of a question of hiring discrimination where the employer is a *municipal police department,* serving a *city-only* population and with a *residency* requirement. Absent those special factors, the court would have approved the District Court's initial finding that the relevant comparison was with the metropolitan labor market, or S.M.S.A. for

Detroit, which was only 18.6% in 1970. The instant case involved a private employer in interstate commerce, which drew its recruits from beyond the limits of the City of Detroit and, indeed, beyond Wayne County. Both Dora Allen and James Allen testified that they resided in Oakland County.

This case therefore falls within the rule of *Hazelwood School District v. United States,* 433 U.S. 299, 308, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977), which held that it is appropriate under the circumstances to look to the qualified labor market for the positions employed by the defendant in the geographic area within which the defendant recruited, and not merely to the population of the political unit of its location. We are here without evidence as to qualifications or outreach, but it is sufficient to note that the 28% figure to which plaintiff points is not evidence of hiring discrimination in an 18.6% S.M.S.A.; and much less is it evidence of disparate treatment in the terms and conditions of employment of those whom the defendant has hired.

Plaintiff also alleges a pattern and practice of disparate treatment in working conditions, overtime distribution, and discipline, since September 22, 1972. This court finds, as with plaintiff's other claims, that a prima facie case that such treatment was "standard operating procedure" has not been made, by a preponderance of the evidence which plaintiff himself has produced.

Numerous grievances were filed by members of the class concerning out-of-class work and overtime, which was required to be posted and equalized, by the union contracts. Union committeeman Page testified that mistakes were indeed made every day, involving both black and white: and there is indeed no evidence of racial *disparity* in treatment, or of any but the best efforts to afford uniform treatment to all employees pursuant to the contracts, since 1972. Mr. Galloway testified that he was overworked as a forklift driver: but Mr. Sanders was also a forklift operator for a time, and made no such complaint, although he made many others. Mr. Page was given the most difficult machine to operate: but for the

stated reason that he was the most qualified machine operator. Matters of discipline were resolved in accordance with the contract, on a case by case basis; and again, no evidence of racial *disparities* was presented.

When defendant closed its Detroit plant in the summer of 1977, the record is clear that almost all employees were given the same consideration, under the special supplemental union agreement which was negotiated that spring. The only exception was plaintiff Sanders who, although he had negotiated the terms of the closing layoff for all others as a union official, hired an attorney to draft his personal stipulation as to the terms of his own departure. Mr. Sanders was also present as a union representative when every member of the plaintiff class was presented with his or her severance pay. Most of the witnesses testified, nevertheless, that they had not seen or ratified the supplemental agreement, and did not realize that acceptance of severance pay was a waiver of their reemployment rights. There is no evidence of disparate treatment at the time of the plant closing.

*PLAINTIFF SANDERS*:

The court finds, finally, that plaintiff Sanders has failed to prove a prima facie case, by a preponderance of the evidence, that the defendant has discriminated against him because of his race since September 22, 1972. Mr. Sanders suffered many unfortunate experiences as an employee of the Acme Quality Paint Company, during the many years prior to 1969. Those experiences have doubtless done much to color his perceptions of events thereafter. However, the decision makers of the 1940's to 1960's were all gone from defendant's plant by 1972, and there remained no lingering impact upon Mr. Sanders, recognizable under the *Griggs* doctrine as a perpetuation of past discriminatory activity.

The test of *McDonnel Douglas* must, therefore, be determinative of Mr. Sanders' claim: and he has not placed into evidence one specific occasion on which he was treated less favorably than *similarly situated* white employees.

Mr. Sanders was never denied any promotion, transfer, or assignment to which he laid claim, in favor of a white, after September, 1972. He was already an employer-selected foreman by 1969, and also had already, by that time, quit that position for a higher-paying hourly position. He held the highest paid hourly jobs in the factory: and was the last black employee to be laid off, at plant closing. He argues here that it is evidence of discrimination that the white union president was laid off *after* he was, even though the contract clearly required the President's retention.

Although Mr. Sanders filed numerous grievances (over 30) and numerous Michigan Civil Rights Commission complaints, the record is barren of any suggestion of retaliation against him. The Civil Rights complaints were all eventually dismissed. The grievances were handled on a case-by-case basis, however frivolous, and evidence no racial disparities. In those instances where the union dropped his grievances, his testimony suggested that the union had participated in some malfeasance. In those instances, which were numerous, where he had grieved against some advantage given a black coworker, he testified that the black was a "favorite son" of discriminatory white supervision.

In short, plaintiff Sanders has not presented a prima facie case, on the preponderance of the evidence, that he was the victim of defendant's racial discrimination in matters of employment since September 22, 1972.

In accordance with these findings of fact and of law, IT IS ORDERED that Plaintiff's Complaint be and it hereby is DISMISSED.